COURT OF APPEALS
DECISION
DATED AND FILED

December 28, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1350**

STATE OF WISCONSIN

Cir. Ct. No. 2017JV304

IN COURT OF APPEALS
DISTRICT III

---

IN THE INTEREST OF T. A., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

    PETITIONER-RESPONDENT,

  V.

T. A.,

    RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Outagamie County: JOHN A. DES JARDINS, Judge. *Reversed and cause remanded for further proceedings*.

¶1     HRUZ, J.[1]  Tanner[2] appeals an order lifting the stay on a previously imposed requirement that he register as a sex offender, and an order denying his motion for postdisposition relief.  Tanner seeks a new hearing to address whether the stay on his sex offender registration should be lifted ("lift-of-stay hearing"), arguing that the circuit court relied on an inaccurate interpretation of his Juvenile Sex Offender Assessment Protocol-II ("J-SOAP-II") score when it concluded that the stay should be lifted.  We agree, and we therefore reverse and remand for a new lift-of-stay hearing.[3]

## BACKGROUND

¶2     In December 2017, the State filed a petition seeking a delinquency adjudication of Tanner, who was sixteen years old at the time, alleging that he had sexual intercourse with a then sixteen-year-old girl after she told him to "stop."  In March 2018, Tanner was evaluated based on the J-SOAP-II, and he received a total J-SOAP-II score of 68%.  Tanner's overall risk to reoffend sexually was considered high.  Tanner later pled no contest to one count of third-degree sexual assault under WIS. STAT. § 940.225(3).  In May 2018, the circuit court issued a dispositional order adjudicating Tanner delinquent and placing him on supervision

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20).  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] For ease of reading, we refer to the appellant in this confidential appeal using a pseudonym, rather than his initials.

[3] Tanner also argues that his counsel at the lift-of-stay hearing provided ineffective assistance.  Because Tanner's inaccurate information claim is dispositive of his appeal, we need not address his ineffective assistance claim.  *See* ***Turner v. Taylor***, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716.

2

for one year. The court also imposed and stayed a requirement that Tanner register as a sex offender pending the successful completion of his supervision.

¶3      In February 2019, the Outagamie County Department of Health and Human Services ("DHHS")—the agency responsible for supervising Tanner—requested that the circuit court lift the stay on Tanner's sex offender registration. The court subsequently held a hearing on DHHS's request in April 2019. Several people testified, including Lauren Cowell—the supervisor of Tanner's DHHS social worker—and Joshua Andreini—Tanner's DHHS therapist. As relevant to this appeal, Cowell testified that Tanner's most recent J-SOAP-II score of 52% indicated that there was "nearly a half and half chance for [Tanner] to re-offend." In addition, Andreini testified that Tanner's total J-SOAP-II score indicated that Tanner "is more likely to re-offend than not," because "it's 52 percent and not 49 percent." When asked what level of risk Tanner's total J-SOAP-II score indicated, Andreini testified that it "indicates a moderate-to-high risk to re-offend, again when you're looking solely at that score alone."

¶4      The circuit court granted DHHS's request and lifted the stay on Tanner's sex offender registration, requiring him to register for a period of fifteen years. In doing so, the court discussed Tanner's J-SOAP-II score while observing that Tanner's moderate-to-high risk to reoffend was definitely a "red flag":

> [Andreini's] final analysis provides that [Tanner] presents now as a moderate-to-high risk to re-offend. He said a lot of positive things though about [Tanner] and his progression, as did Social Worker Cowell. Um, so he's made vast improvements in getting his score reduced. But the current level of moderate-to-high risk to re-offend is definitely a red flag for the Court.

3

The court also identified other "red flags," including Tanner's apparent failure to accept responsibility for the sexual assault of the victim, his Facebook posts containing sexual and abusive content toward women, and his concerning behavior toward a female at a juvenile shelter.

¶5     In April 2020, Tanner filed a motion for postdisposition relief, arguing, in part, that he was entitled to a new lift-of-stay hearing because the circuit court relied on an inaccurate interpretation of his total J-SOAP-II score when deciding to lift the stay on his sex offender registration requirement.[4] Alternatively, Tanner argued that his counsel provided ineffective assistance at the lift-of-stay hearing by failing to object, or correct, the inaccurate interpretation of his J-SOAP-II score.  In support of his motion, Tanner filed two reports written by a psychologist, Dr. Nick Yackovich.  The first discussed, in part, how Tanner's J-SOAP-II score was incorrectly interpreted during the lift-of-stay hearing, and the second discussed Yackovich's independent psychosexual evaluation of Tanner. The court held several hearings on Tanner's motion.

¶6     At the first hearing, Dr. Yackovich testified that a total J-SOAP-II score of 52% does not mean "that a person has a 52 percent likelihood of re-offending sexually or that he's more likely than not to re-offend sexually."[5]

---

[4] Tanner also argued that he was entitled to a new hearing under WIS. STAT. § 938.46, based on newly discovered evidence, but he does not pursue that argument on appeal.

[5] Yachovich testified that the J-SOAP-II is "an actuarial risk assessment instrument used to assess general risks and treatment needs for individuals up to the age of 18 …."  He described an actuarial risk assessment as "a statistical formulation to determine likelihoods of potential outcomes based on" "particular populations and … the variables associated with those populations."  When explaining the meaning of the 52% J-SOAP-II score, Yachovich stated that "52 percent of the answers were scored positively, simply meaning that … of the sample that did commit another crime, 52 percent of them would have had a similar set of variables that … [Tanner] did."

Yackovich testified that a J-SOAP-II score should only be used as one part of an offender's overall risk assessment. Yackovich further testified that he completed a psychosexual evaluation of Tanner in January 2020, and he concluded that Tanner, despite having some behavioral deficits, "was in the low to lower risk range" to sexually reoffend.

¶7    At the second hearing, Andreini testified that he improperly assigned a category of risk to Tanner based on Tanner's J-SOAP-II score alone. He testified that the J-SOAP-II score "is one factor … that we would look at but that score alone should not be used to determine [an] individual's level of risk." Andreini further testified, however, that after considering other relevant factors, his original moderate-to-high risk assessment of Tanner remained accurate. In addition, Cowell testified that she inaccurately represented that Tanner's J-SOAP-II score indicated nearly a half-and-half chance for him to reoffend.

¶8    The circuit court denied Tanner's motion for postdisposition relief. The court first noted that "it is not contested that the J-SOAP analysis was inaccurately interpreted at the time that the court lifted the stay order …." But the court recognized that there were many factors that went into its decision and that its decision "was not solely based upon the J-SOAP analysis …." The court concluded that Tanner's behavior was "a greater factor" than the J-SOAP-II analysis and that the error regarding the J-SOAP-II score "did not significantly change the Court's opinion as to whether or not [Tanner] should register as a sex offender." The court also concluded that Tanner's counsel did not provide ineffective assistance at the lift-of-stay hearing. Tanner now appeals.

**DISCUSSION**

¶9 Tanner argues that he is entitled to a new lift-of-stay hearing because the circuit court relied on an inaccurate interpretation of his total J-SOAP-II score in deciding to lift the stay on his sex offender registration requirement. Citing *G.G.D. v. State*, 97 Wis. 2d 1, 8, 292 N.W.2d 853 (1980), Tanner contends that he has the same constitutional due process rights during the dispositional phases of a delinquency proceeding as a criminal defendant does during sentencing. *See State v. Coffee*, 2020 WI 1, ¶2, 389 Wis. 2d 627, 937 N.W.2d 579. Tanner then applies the same analysis used for a criminal defendant's claim of inaccurate information at sentencing to conclude that he is entitled to a new lift-of-stay hearing. The State does not contest Tanner's argument regarding his due process rights in this context or the proper analysis to apply to his current inaccurate information claim. For purposes of this decision, we therefore assume, without deciding, that a stay on sex offender registration must be lifted upon accurate information and that the same analysis used for claims regarding inaccurate information at sentencing applies in this context.

¶10 We apply a burden-shifting analysis to determine whether a defendant is entitled to resentencing based on the circuit court's reliance on inaccurate information at sentencing. *Id.*, ¶38. The defendant must first demonstrate, by clear and convincing evidence, that: (1) some information at the original sentencing was inaccurate; and (2) the court actually relied on the inaccurate information at sentencing. *Id.* A court actually relies on inaccurate information when it gives "explicit attention" or "specific consideration" to the inaccurate information, so that the inaccurate information "formed part of the basis for the sentence." *Id.* (citation omitted).

¶11 If the defendant satisfies his or her burden, the burden shifts to the State to prove beyond a reasonable doubt that the error was harmless. *Id.* An error is harmless if there is no reasonable probability that the error contributed to the outcome. *State v. Payette*, 2008 WI App 106, ¶46, 313 Wis. 2d 39, 756 N.W.2d 423. The State can prove harmless error by demonstrating beyond a reasonable doubt that the court would have made the same decision absent its reliance on inaccurate information. *Coffee*, 389 Wis. 2d 627, ¶38. Whether a defendant has been sentenced in violation of his or her due process rights, and whether that error is harmless, are questions of law that we review de novo. *Id.*, ¶17. We are not bound by a circuit court's assertions during a postconviction hearing that its decision would have been the same absent its reliance on inaccurate information. *See State v. Travis*, 2013 WI 38, ¶¶73, 77, 347 Wis. 2d 142, 832 N.W.2d 491.

¶12 Tanner has shown by clear and convincing evidence that some information at the lift-of-stay hearing was inaccurate. Indeed, it is undisputed that Cowell and Andreini inaccurately testified, respectively, that Tanner's J-SOAP-II score demonstrated that Tanner had "nearly a half and half chance … to re-offend" and that the score established that Tanner was "more likely to re-offend than not." As Dr. Yackovich testified, however, a 52% J-SOAP-II score does not mean "that a person has a 52 percent likelihood of re-offending sexually or that he's more likely than not to re-offend sexually." Both Cowell and Andreini agreed with that statement at the postdisposition hearing. It is also undisputed that Andreini inaccurately testified that Tanner's J-SOAP-II score alone indicated that he was a moderate-to-high risk to reoffend. As Andreini later recognized, a total J-SOAP-II score alone "should not be used to determine [an] individual's level of risk."

¶13    Although the State agrees that there was inaccurate testimony presented regarding how Tanner's J-SOAP-II score alone demonstrated a moderate-to-high risk to reoffend, the State nonetheless argues that Andreini's moderate-to-high risk assessment remained accurate.  The State further argues that while the circuit court explicitly relied on Andreini's moderate-to-high risk assessment, the court did not rely on Andreini's stated basis for the moderate-to-high risk assessment—i.e., that Tanner's J-SOAP-II score alone indicated a moderate-to-high risk to reoffend.  The State therefore argues that the court did not actually rely on the inaccurate testimony.

¶14    The State's attempt to divorce the moderate-to-high risk assessment from the stated basis of that assessment—i.e., Tanner's J-SOAP-II score—fails.  Andreini testified that Tanner's total J-SOAP-II score alone indicated a moderate-to-high risk to reoffend, and he did not testify that such risk assessment was based on any other factors.  Importantly, consistent with Andreini's testimony, the circuit court discussed Tanner's J-SOAP-II score in the context of Andreini's moderate-to-high risk assessment, linking the two concepts together:

> [Andreini's] final analysis provides that [Tanner] presents now as a moderate-to-high risk to re-offend.  He said a lot of positive things though about [Tanner] and his progression, as did Social Worker Cowell.  Um, so he's made vast improvements in getting his score reduced.  But the current level of moderate-to-high risk to re-offend is definitely a red flag for the Court.

Because the court transitioned from Andreini's moderate-to-high risk assessment to Tanner's J-SOAP-II score and then back to the risk assessment, the court must have believed that Tanner's J-SOAP-II score indicated a moderate-to-high risk to reoffend.  These statements also demonstrate that the court viewed Tanner's improved J-SOAP-II score in the context of Andreini's inaccurate interpretation of

it—discounting the improved J-SOAP-II score because the score still purportedly demonstrated a moderate-to-high risk to reoffend. The court's discussion demonstrates "explicit attention" to Andreini's inaccurate testimony, such that Andreini's inaccurate testimony "formed part of the basis" of the court's decision to lift the stay on Tanner's sex offender registration requirement. *See Coffee*, 389 Wis. 2d 627, ¶38 (citation omitted). Tanner has therefore demonstrated by clear and convincing evidence that the court actually relied on inaccurate information.

¶15 The State nevertheless contends that the circuit court's reliance on inaccurate information was harmless beyond a reasonable doubt. The State argues that the court still would have lifted the stay even absent the inaccurate information because a preponderance of the evidence existed to prove that Tanner violated a condition of his dispositional order and because the court would have identified the same red flags noted in its decision, which were unrelated to Tanner's J-SOAP-II score. We reject each of these arguments.

¶16 As Tanner correctly points out, WIS. STAT. § 938.34(16) does not require that a circuit court impose the original dispositional order when a violation of the dispositional order occurs. Instead, it gives a court discretion to impose the original dispositional order upon finding, by a preponderance of the evidence, that the juvenile violated a condition of the dispositional order. *See id.*; *see also State v. Andrew J. K.*, 2006 WI App 126, ¶13, 293 Wis. 2d 739, 718 N.W.2d 229. Therefore, proof of Tanner violating the dispositional order does not resolve the issue here—i.e., whether the court would have, in exercising its discretion, decided to lift the stay on Tanner's sex offender registration requirement absent the inaccurate testimony that Tanner's J-SOAP-II score indicated a moderate-to-high risk to reoffend.

¶17    In addition, although the moderate-to-high risk assessment was one of several "red flags" that the circuit court discussed, the court's comments do not indicate that any red flag weighed more heavily than another in the court's decision or that the other red flags were dispositive. The risk assessment was also not insignificant to the court's decision. The moderate-to-high risk assessment was the first red flag the court identified. While acknowledging that Tanner had progressed and made improvements, the court immediately dismissed those improvements because "the current level of moderate-to-high risk to re-offend is definitely a red flag for the Court." Moreover, under conditions sixteen and seventeen of the dispositional order, the court was required to consider whether Tanner demonstrated a sufficiently low risk to reoffend based on his compliance with certain conditions, one of which expressly included his J-SOAP-II score. An assessment of Tanner's risk to reoffend was therefore highly relevant to what the court had to consider, and did consider, when deciding to lift the stay on Tanner's sex offender registration requirement.

¶18    Andreini's reaffirmation of his moderate-to-high risk assessment at the postdisposition hearing also does not render the inaccurate information harmless. The underlying basis for Andreini's original moderate-to-high risk assessment was Tanner's J-SOAP-II score alone. Andreini later reaffirmed his moderate-to-high risk assessment, but only after he learned that his original risk assessment, based on Tanner's J-SOAP-II score alone, was inaccurate, and after he incorporated other factors into his risk assessment. In essence, Andreini's risk assessment shifted from a projection based solely on Tanner's J-SOAP-II score to a projection based on Andreini's personal analysis of multiple factors, including Tanner's J-SOAP-II score. The circuit court, in its original decision, never had an opportunity to consider Andreini's subsequent risk assessment in light of a proper

interpretation of Tanner's J-SOAP-II score. We simply have no basis to conclude that the court would have given the same weight to Andreini's moderate-to-high risk assessment had the court known that the risk assessment was based on Andreini's own personal analysis rather than being derived from Tanner's J-SOAP-II score alone.

¶19 Finally, the State argues that the circuit court's reliance on Andreini's inaccurate testimony was harmless because a DHHS memorandum accurately described how DHHS "came to the 'moderate to high risk' determination …." Contrary to the State's arguments, however, that memorandum never concluded that Tanner was currently a "moderate-to-high" risk to reoffend. Rather, the memorandum concluded that "[Tanner] remains *a risk* to reoffend" based on his most recent J-SOAP-II score and DHHS's overall assessment of him. (Emphasis added). The memorandum never stated whether Tanner's current "risk" was high, moderate or low. The memorandum did acknowledge that "[Tanner's] overall risk to reoffend sexually was found to be in the moderate to high range" after an October 2, 2018 assessment, but it did not mention any risk range for the most recent April 2, 2019 assessment, in which Tanner's J-SOAP-II score improved. Accordingly, the memorandum did not provide an independent basis for the court to conclude that Tanner was a moderate-to-high risk to reoffend.

¶20 Under the present circumstances, we cannot conclude, beyond a reasonable doubt at least, that the circuit court would have lifted the stay on Tanner's sex offender registration requirement absent its reliance on inaccurate

information. We therefore reverse and remand for a new lift-of-stay hearing consistent with this opinion.[6]

*By the Court.*—Orders reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[6] On appeal, Tanner has specifically requested a new lift-of-stay hearing, which is the relief we grant. Neither party disputed, and thus we do not address, the circuit court's ability to amend the dispositional order on remand.